# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 1984AP970-D |
| COMPLETE TITLE: | In the Matter of Disciplinary Proceedings Against John J. Balistrieri, Attorney at Law: <br><br> Office of Lawyer Regulation, <br>         Complainant, <br>     v. <br> John J. Balistrieri, <br>         Respondent. |

DISCIPLINARY PROCEEDINGS AGAINST BALISTRIERI

| | |
|---|---|
| OPINION FILED: | August 12, 2014 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|    COURT: | |
|    COUNTY: | |
|    JUDGE: | |

| | |
|---|---|
| JUSTICES: | |
|    CONCURRED: | |
|    DISSENTED: | BRADLEY, J., dissent. (Opinion filed.) |
|    NOT PARTICIPATING: | ROGGENSACK, J., withdrew from participation. |

ATTORNEYS:

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 1984AP970-D

STATE OF WISCONSIN                    :          IN SUPREME COURT

**In the Matter of Disciplinary Proceedings Against John J. Balistrieri, Attorney at Law:**

**Office of Lawyer Regulation,**

          Complainant,

     **v.**

**John J. Balistrieri,**

          Respondent.

**FILED**

**AUG 12, 2014**

Diane M. Fremgen
Clerk of Supreme Court

ATTORNEY reinstatement proceeding.     *Reinstatement denied.*

¶1     PER CURIAM.     We review the report and recommendation of the referee, Attorney Richard C. Ninneman, that the license of Attorney John J. Balistrieri to practice law in Wisconsin should be reinstated. Although the Office of Lawyer Regulation (OLR) strenuously opposed Attorney Balistrieri's reinstatement petition before the referee, it did not appeal the referee's recommendation. We therefore review the referee's report and

recommendation pursuant to Supreme Court Rule (SCR) 22.33(3).[1] After fully reviewing this matter, we conclude that Attorney Balistrieri has not satisfied the criteria required to resume the practice of law in this state, and we therefore deny his petition for reinstatement. We also determine that Attorney Balistrieri should be required to pay the costs of this reinstatement proceeding, which were $41,459.40 as of February 4, 2013.

¶2 The standards that apply to all petitions for reinstatement after a disciplinary suspension or revocation are set forth in SCR 22.31(1).[2] In particular, the petitioning

---

[1] SCR 22.33(3) provides that "[i]f no appeal is timely filed, the supreme court shall review the referee's report, order reinstatement, with or without conditions, deny reinstatement, or order the parties to file briefs in the matter."

[2] SCR 22.31(1) states:

The petitioner has the burden of demonstrating, by clear, satisfactory, and convincing evidence, all of the following:

(a) That he or she has the moral character to practice law in Wisconsin.

(b) That his or her resumption of the practice of law will not be detrimental to the administration of justice or subversive of the public interest.

(c) That his or her representations in the petition, including the representations required by SCR 22.29(4)(a) to [(4m)] and 22.29(5), are substantiated.

(continued)

2

attorney must demonstrate by clear, satisfactory, and convincing evidence that he or she has the moral character necessary to practice law in this state, that his or her resumption of the practice of law will not be detrimental to the administration of justice or subversive of the public interest, and that the attorney has complied fully with the terms of the suspension or revocation order and the requirements of SCR 22.26. In addition, SCR 22.31(1)(c) incorporates the statements that a petition for reinstatement must contain pursuant to SCR 22.29(4)(a)-[(4m)].[3] Thus, the petitioning attorney must

---

(d) That he or she has complied fully with the terms of the order of suspension or revocation and with the requirements of SCR 22.26.

[3] SCR 22.29(4)(a) through (4m) provides that a petition for reinstatement shall show all of the following:

(a) The petitioner desires to have the petitioner's license reinstated.

(b) The petitioner has not practiced law during the period of suspension or revocation.

(c) The petitioner has complied fully with the terms of the order of suspension or revocation and will continue to comply with them until the petitioner's license is reinstated.

(d) The petitioner has maintained competence and learning in the law by attendance at identified educational activities.

(e) The petitioner's conduct since the suspension or revocation has been exemplary and above reproach.

(f) The petitioner has a proper understanding of and attitude toward the standards that are imposed

(continued)

3

demonstrate that the required representations in the reinstatement petition are substantiated.

¶3 When reviewing referee reports in reinstatement proceedings, we utilize standards of review similar to those we use for reviewing referee reports in disciplinary proceedings. We do not overturn a referee's findings of fact unless they are clearly erroneous. On the other hand, we review a referee's legal conclusions, including whether the attorney has satisfied the criteria for reinstatement, on a de novo basis. In re

---

upon members of the bar and will act in conformity with the standards.

(g) The petitioner can safely be recommended to the legal profession, the courts and the public as a person fit to be consulted by others and to represent them and otherwise act in matters of trust and confidence and in general to aid in the administration of justice as a member of the bar and as an officer of the courts.

(h) The petitioner has fully complied with the requirements set forth in SCR 22.26.

(j) The petitioner's proposed use of the license if reinstated.

(k) A full description of all of the petitioner's business activities during the period of suspension or revocation.

(4m) The petitioner has made restitution to or settled all claims of persons injured or harmed by petitioner's misconduct, including reimbursement to the Wisconsin lawyers' fund for client protection for all payments made from that fund, or, if not, the petitioner's explanation of the failure or inability to do so.

Disciplinary Proceedings Against Jennings, 2011 WI 45, ¶39, 334 Wis. 2d 335, 801 N.W.2d 304; In re Disciplinary Proceedings Against Gral, 2010 WI 14, ¶22, 323 Wis. 2d 280, 779 N.W.2d 168.

¶4 Attorney Balistrieri was admitted to practice law in Wisconsin in August 1973, following his graduation from Valparaiso University Law School. He and his brother, Joseph Balistrieri (Joseph), subsequently engaged in a private law practice in Milwaukee.

¶5 In 1981 a federal grand jury indicted Attorney Balistrieri, along with his brother Joseph and his father Frank.[4] Following a six-week trial in 1984, a jury found Attorney Balistrieri guilty of conspiracy to obstruct commerce by extortion. The conviction was affirmed by the United States Court of Appeals for the Seventh Circuit. United States v. Balistrieri, 778 F.2d 1226, 1228, 1232 (7th Cir. 1985). The referee downplays Attorney Balistrieri's role in the crime, laying most of the blame at the feet of his father Frank. He describes the facts underlying the convictions as Frank threatening an undercover FBI agent with physical violence for starting a vending machine business in Milwaukee without his permission and then forcing the undercover agent to give him a hidden ownership interest in the new business. The referee

---

[4] The referee describes Frank Balistrieri as "the reputed head of the Mafia in Milwaukee" at that time. According to the referee, the Shorecrest Hotel in Milwaukee, which was held in ownership under Joseph Balistrieri's name, "allegedly was the headquarters of the 'mob' in Wisconsin."

states that the role of Attorney Balistrieri and his brother Joseph was limited to drafting the legal documents that gave their father a legally enforceable interest in the vending business.

¶6 In its decision on the direct appeal filed by the Balistrieris, the United States Court of Appeals for the Seventh Circuit did not so limit the role of the Balistrieri sons in its description of the facts underlying the charges:

> The essential facts in this extortion scheme are that between May 1978 and February 1979 the Balistrieris, Ruggiero, and allegedly SaBella conspired to extort sums of money and a one-half partnership interest in the Best Vending Company. FBI Agent Gail Cobb, using the alias Tony Conte, operated the Best Vending Company. Between 1976 and 1981, FBI Special Agent Joseph Pistone was operating under the alias Donnie Brasco as an undercover agent investigating organized crime activities in New York City. During this time he developed a close working relationship with Ruggiero, who described himself as a member of the Bonanno crime family of New York. Pistone mentioned to Ruggiero that Cobb had moved to Milwaukee and was trying to open a vending machine business there.

> Subsequently Ruggiero told Cobb that the vending business in Milwaukee was controlled by "the mob" and that Cobb could not enter that business without "protection" from the mob figures who controlled that business. After inducing Cobb to pay money to him, Ruggiero arranged for Cobb to meet with Frank Balistrieri, so that Cobb could obtain permission from Balistrieri to do business in Milwaukee.

> On July 29, 1978, Cobb had a meeting with Frank Balistrieri and others in Milwaukee during which Frank Balistrieri made threats against Cobb because Cobb had attempted to start a vending machine business in Milwaukee without his permission. Later, in the presence of John and Joseph Balistrieri, Frank

6

Balistrieri told Cobb that he was to share his vending business with the Balistrieris. Cobb agreed to permit the Balistrieris to become secret partners in his business, and the Balistrieris began directing Cobb in his conduct of the business.

Balistrieri, 778 F.2d at 1228.

¶7 The federal district court initially sentenced Attorney Balistrieri to eight years of imprisonment and imposed a $20,000 fine.[5] The prison term was subsequently reduced to five years. Attorney Balistrieri ultimately served approximately 39 months in a federal prison. He was released in April 1989.

¶8 As a result of Attorney Balistrieri's conviction, this court summarily suspended his license to practice law on June 6, 1984. As shown by documents in this court's public files in the original disciplinary proceeding, Attorney Balistrieri reached an agreement with the Board of Attorneys Professional Responsibility (BAPR), the predecessor to the OLR, that he would not challenge the summary suspension and that the summary suspension would remain in effect while any direct appeal of his conviction was still pending. The agreement further provided that if Attorney Balistrieri's conviction were affirmed, his law license would be revoked at that time. Following the issuance of the Seventh Circuit's decision affirming his conviction, this court revoked Attorney Balistrieri's license to practice law in

---

[5] Frank Balistrieri was sentenced to 13 years of imprisonment and fined $5,000. Joseph Balistrieri received the same sentence as his brother.

this state on January 21, 1987, pursuant to his agreement with BAPR.

¶9 Following his 1989 release from prison, Attorney Balistrieri returned to Milwaukee to live and work at the Shorecrest Hotel (Shorecrest),[6] where he served as the on-site operations manager[7] until his brother Joseph's death in 2010, when Attorney Balistrieri inherited ownership of the property and took over sole control of the property and business. Within a relatively short time after inheriting the hotel, Attorney Balistrieri sold the property in 2011 for approximately $8 million.[8] In addition, during the time that he worked for or owned the property, Attorney Balistrieri owned and operated a separate small business that offered laundry services at the Shorecrest.

---

[6] Attorney Balistrieri described the Shorecrest as primarily a high-rise apartment complex that contained a few overnight hotel rooms so that the hotel license could be maintained.

[7] At the reinstatement evidentiary hearing, Attorney Balistrieri likened his brother's role in the Shorecrest to being the chairman of the board, overseeing policy decisions, while he fulfilled the role of chief operating officer. More specifically, Attorney Balistrieri testified that he oversaw the daily operation of the property/business. He supervised the maintenance department, the housekeeping department, the administrative department, and the front desk. He also was responsible for maintaining the books and records of the business. He stated that he was on call seven days a week and 365 days a year to handle issues that arose with the operation of the property.

[8] The referee notes that the sale of the Shorecrest was designated as the 2011 outstanding business transaction of the greater Milwaukee area by the Milwaukee edition of The Business Journal.

¶10 In 1995 Attorney Balistrieri filed a petition for the reinstatement of his license to practice law. In the course of that reinstatement proceeding, the then United States Attorney for the Eastern District of Wisconsin, Thomas P. Schneider, the then Wisconsin Attorney General, James E. Doyle, and the then Milwaukee County District Attorney, E. Michael McCann, all submitted letters opposing Attorney Balistrieri's reinstatement petition. Ultimately, after an evidentiary reinstatement hearing, BAPR recommended to this court that the petition be denied, finding that Attorney Balistrieri had not met his burden to prove that he had a proper understanding of and attitude toward the standards imposed on lawyers and that he could not be recommended as a person fit to act as an officer of the court.

¶11 Shortly after BAPR's recommendation, Attorney Balistrieri attempted to withdraw his petition. In an affidavit supporting his withdrawal request, he alleged that BAPR's report and recommendation "clearly demonstrate[d] a hostile bias against [Attorney Balistrieri] which affiant believes to be the product of political expedience and ethnic prejudice against Italian-Americans in general and affiant in particular." The court denied the request to withdraw, and after a period of inactivity in the matter, dismissed the petition in March 2001.

¶12 In 2012 Attorney Balistrieri filed a second petition for the reinstatement of his license to practice law in this state. The referee conducted a three-day reinstatement hearing, at which 14 witnesses testified. In addition, the referee received a substantial number of letters in support of Attorney

Balistrieri's reinstatement. He also received two letters from Attorney Balistrieri's sister, who did not explicitly express a desire that the petition for reinstatement be denied but clearly criticized her brother's character and alleged improper actions by him.

¶13 The referee ultimately recommended reinstatement. He concluded that Attorney Balistrieri had proven by clear and convincing evidence that he sincerely desires to have his license reinstated, that he has not practiced law during the period of his suspension and revocation, that he has complied with the terms of the suspension and revocation orders, and that he has maintained competence and learning in the law. We accept the referee's findings and conclusions on these requirements for reinstatement.

¶14 The issues in this reinstatement proceeding, however, relate to other requirements for reinstatement, namely whether the petitioning attorney has demonstrated that he has the moral character to practice law in this state, that his conduct since the suspension and revocation of his license has been exemplary and above reproach, that he has a proper understanding of and attitude toward the standards that are imposed upon members of the bar and will act in conformity with them, and that he can be safely recommended as a person fit to represent clients and to aid in the administration of justice in this state. SCRs 22.29(e)-(g) and 22.31(a).

¶15 The referee's report addresses a number of issues that relate to these requirements, which admittedly are interrelated

10

and overlapping. The referee concludes that despite these issues, Attorney Balistrieri has met his burden on all of these requirements by clear and convincing evidence. We are not persuaded.

¶16 The referee begins with the impact of Attorney Balistrieri's conduct while previously licensed and of his 1984 conviction on his current petition for reinstatement. Although the referee acknowledged the conviction and even described it at one point in his report as "clearly serious," he did not think that the misconduct committed by Attorney Balistrieri in the 1970s and 1980s showed a moral character that should prevent Attorney Balistrieri from returning to the practice of law at this time.

¶17 The OLR has offered into evidence in this reinstatement proceeding the letter that then U.S. Attorney Thomas Schneider filed in response to Attorney Balistrieri's 1995 reinstatement petition. The lengthy letter provides a fairly detailed description of the events that underlay the criminal convictions of the Balistrieris. Attached to that letter are a sizeable number of documents, including newspaper articles from the time and a copy of a transcript of a conversation among Frank, Joseph, and John Balistrieri that was secretly recorded by federal authorities.

¶18 Although the referee acknowledged Attorney Balistrieri's 1984 conviction, he essentially disregarded the letter submitted by then U.S. Attorney Schneider. The referee's stated reasons for giving "no great weight" to Attorney

11

Schneider's letter were that there was no evidence that Attorney Schneider was in the U.S. Attorney's office at the time of the prosecution of the Balistrieris in the 1980s and that the letter's references to the "mob," "La Cosa Nostra," and the "Mafia" were inflammatory and really directed at Frank Balistrieri, not Attorney Balistrieri.

¶19 On the other hand, the referee gave "great weight" to the fact that Attorney Balistrieri apparently had not been present at the time that his father had threatened the FBI undercover agent with physical harm if the agent did not give him a secret interest in the vending machine business. He also was apparently moved by the fact that Frank Balistrieri had rejected a plea agreement in which the federal government would have dismissed the charges against the Balistrieri sons in exchange for Frank Balistrieri's guilty plea. The referee commented that "[a]pparently loyalty in the Balistrieri family was a one-way street."

¶20 This court recognizes that the events of the 1980s and the crime of which Attorney Balistrieri was convicted are now several decades old. We are not averse to providing a second chance to hold a law license to individuals who clearly accept responsibility for their wrongdoing and demonstrate that they have a different attitude toward complying with both our society's general laws and the ethical rules that apply to attorneys who are licensed to practice law in this state.

¶21 The record in this instance, however, does not demonstrate that Attorney Balistrieri has clearly and

12

convincingly proven that he has the required moral character to practice law, that he has a proper attitude toward society's laws and the standards imposed on members of bar, and that he is fit to represent clients and to aid in the administration of justice as a member of this state's bar. See SCR 22.29(4)(f) and (g).

¶22 The record reveals a pattern of a lack of acceptance of responsibility over the years that have passed since Attorney Balistrieri's conviction. When BAPR recommended against the reinstatement of his license in 1995, in large part based on its conclusion that he had not accepted responsibility for his criminal conduct, Attorney Balistrieri ultimately responded by claiming that BAPR was biased against him because of his Italian heritage. He attacked the integrity of the reinstatement process with a completely unsupported charge of ethnic bias rather than demonstrate how his words and actions showed that he now understood that he needed to obey both the letter and the spirit of the law and the ethical rules governing attorneys.

¶23 In 2002 Attorney Balistrieri was deposed as part of a lawsuit that he and his brother filed against a distant relative, Jennie Alioto, the substance of which will be discussed in more detail below. A portion of the deposition transcript, however, demonstrates how Attorney Balistrieri's attitude toward his convictions and government agencies that enforce the law had not changed. When opposing counsel asked for his work history, Attorney Balistrieri described the period from 1984 to 1989 as a time when he had been "employed by the

13

United States government." The opposing counsel subsequently asked for some clarification, and the following exchange ensued:

Q    Now, from '84 to '89 when you were working for the government, could you be more specific?

A    I was in charge of the Recreation Department at the FCI[9] Latuna Penitentiary.

Q    What were you convicted of?

A    I was convicted of a conspiracy to attempt to commit an extortion. Pretty esoteric stuff.

. . . .

Q    Is that the only conviction on your record?

A    Let's see. These indictments were brought by a homosexual child molester with a cocaine habit who admitted having bad decision-making processes during the time. So two indictments were dismissed. Then I went to trial after six weeks. I was acquitted, then we went to Kansas City for six months and the judge threw that out on a Rule 29 motion. So, yes, that's the only time I was convicted.

¶24 Even assuming that Attorney Balistrieri was being sarcastic, his answer demonstrates either a refusal to take his conviction seriously or a contempt for the federal law enforcement officials who investigated and prosecuted the case against him. His response also indicates that he did not view the deposition that was being taken of him as a matter worthy of being treated with the seriousness that a legal proceeding warrants.

---

[9] "FCI" is an abbreviation for "Federal Correctional Institution."

14

¶25 In the present reinstatement proceeding, Attorney Balistrieri has asserted that he has now come to accept the judgment of the federal court that convicted him. He is very clear, however, to specify only that he is accepting the fact that the federal court convicted him and that he should no longer be angry or resentful about his conviction. He even goes so far as to say that he "made a mistake," although he does not explain what that mistake was, and that he broke the criminal law. While he is now willing to say that his attitude has changed and he accepts that there was a conviction, he also explicitly testified yet in this proceeding that he did nothing wrong, which means that the conviction must still be illegitimate to some degree in his view:

> Q So I have read the indictment, and you submitted a response to questionnaire in terms of an explanation. Can you -- this is what I want you to explain. I don't want to lead you. This is your chance to explain, if you can. Can you explain what you did that caused you to be charged with the conspiracy to extort in Count 1?
>
> The Witness: According to the indictment now, not according to my perspective -- **from my perspective, I really didn't do anything** -- but according to the indictment, there was allegedly a threat made by my father to an undercover FBI agent who was sent here to initiate a sting operation on the theory that we controlled the vending and amusement game business in the City of Milwaukee.

(Emphasis added.)

¶26 We are not making a full and unconditional confession of one's crime a prerequisite to the reinstatement of a law license for everyone who has committed a crime. What Attorney

15

Balistrieri was obligated to prove by clear and convincing evidence, however, was that he has a good moral character, that he possesses a proper attitude toward the standards that are imposed upon members of the bar of this state, which includes both the general law and the Rules of Professional Conduct for Attorneys, and that he will act in conformity with them. His grudging acceptance of the fact of his conviction after decades of besmirching the individuals who did their job in investigating and prosecuting him or who acted within their proper role in the lawyer regulation system is not enough to meet that standard.

¶27 We are also troubled by Attorney Balistrieri's failure to report as income for tax purposes significant amounts of money he received from his brother or the Shorecrest operations and his failure to provide an adequate explanation for those monies when responding to the OLR's inquiries.[10] In the 2002 deposition described above, Attorney Balistrieri said that from 1989 to the time of that deposition he had "been in partnership with my brother Joseph." When asked what that meant, Attorney Balistrieri responded, "That means what we do we do together." After initially refusing to explain what he did in that

---

[10] Because the referee downplayed the significance of the tax issue, he did not make detailed findings of fact on this subject. The facts set forth in the following paragraphs of this opinion, however, were not in dispute. We are not therefore usurping the role of the referee as the fact-finder. The undisputed facts regarding this issue are sufficient to demonstrate our point below.

16

partnership, Attorney Balistrieri stated, "My business is right now we operate the Shorecrest Hotel. You know that. We're in partnership together."

¶28 In the present reinstatement proceeding, Attorney Balistrieri asserted that during his brother's lifetime he had no ownership interest in the Shorecrest Hotel, that the hotel was owned solely by his brother, and that his brother made all of the final decisions regarding business policy and disbursements. He described himself as the "operations manager" or "chief operating officer." This meant that he handled the daily operations of the building, including, inter alia, dealing with rent collections, bank deposits, personnel issues, tenant issues, license applications, city inspections, and maintenance of the property (both major and minor repairs). He asserted that he had to be available at all hours of the day and night to take care of whatever problems arose.

¶29 In exchange for his work overseeing the daily operations of the Shorecrest, Attorney Balistrieri received a substantial number of benefits. For example, he acknowledged that he received the ability to live rent-free in one of the Shorecrest's apartments, and the Shorecrest or his brother paid for his telephone, electricity, heat, health insurance, laundry, cable television, and certain other living expenses. At some point, the hotel or his brother also provided him with a car.

¶30 Attorney Balistrieri did not receive a regular salary or wage in exchange for his work at the Shorecrest. He did, however, receive a significant number of what both he and the

17

referee referred to as "draws" or "owner's draws" that Joseph Balistrieri took from the Shorecrest's revenues or accumulated assets and shared with Attorney Balistrieri in equal amounts. The yearly amount of these draws, according to documents provided by Attorney Balistrieri, varied from year to year and ranged during the period of 1997 to 2007 from $5,000 to $31,000. The total amount for that eleven-year period was approximately $200,000.

¶31 Attorney Balistrieri described at the evidentiary hearing the process for determining when these "draws" were taken and in what amounts as follows:

> Well, Joe would call me in and he'd say, "What's our cash situation? Can we take a draw?" And I'd run it down for him what our cash position was, and then he would decide whether or not we should take a draw and if we took a draw, how much we should take.

¶32 In his response to the OLR's reinstatement questionnaire, Attorney Balistrieri similarly stated that his brother and he would draw money from the business and share that on a 50/50 basis, just as they shared "other income [Attorney Balistrieri] brought in from the non-hotel business projects that [he] worked on." Thus, he acknowledges that, while his brother may have signed the checks to him that were his portion of the "draws", the money he received, like the money his brother received, came from drawing money out of the business. Further, he acknowledges that the draws he received out of the revenue or assets of the business were in exchange for the work that he performed at the hotel: "For my work at the hotel, my

18

brother and I would draw money to the business account as an owner's draw."

¶33 In a letter submitted by Attorney Balistrieri's counsel on his behalf prior to the evidentiary hearing, Attorney Balistrieri asserted that the benefits he received from the hotel business and his brother were frequently treated as "loans" or "loan repayments." Although Attorney Balistrieri provided copies of the checks for these "draws" and those copies were admitted as an exhibit, he did not submit into evidence any exhibit that substantiated the loans or the fact that the money he received as "draws" was really the repayment of loans he had previously made to the Shorecrest or his brother.

¶34 At the reinstatement evidentiary hearing, Attorney Balistrieri's accountant stated that none of the money Attorney Balistrieri received from the draws on the Shorecrest accounts was recognized or reported as income to Attorney Balistrieri. He did not say that the money was not income because it was considered the repayment of loans. Instead, he essentially gave an expert opinion that the money was not income to Attorney Balistrieri because Joseph Balistrieri, as the owner of the Shorecrest, had been under no legal obligation to give the money to Attorney Balistrieri, thereby making the thousands of dollars mere gifts to Attorney Balistrieri. When Attorney Balistrieri subsequently resumed his testimony at the hearing and was questioned about these payments, he now claimed that he had made a mistake about the nature of those payments and that they had really just been gifts from his brother to him.

19

¶35 The OLR presented the testimony of an expert witness on the tax issue, an attorney and tax practitioner with a large accounting firm, who had previously worked for the Chief Counsel of the Internal Revenue Service (IRS). The OLR's witness opined that he did not see how the "draws" paid to Attorney Balistrieri could be considered "gifts" for income tax purposes. He stated that the determination of whether money paid to an employee was a gift would require an analysis of all the facts and circumstances surrounding the payment, not merely an assertion that someone intended to characterize the payment as a gift. He further stated that, other than the accountant's assertion that Joseph Balistrieri had been under no legal obligation to make payments to Attorney Balistrieri, there was no evidence to support characterizing those payments as gifts. Indeed, he stated his view on this quite emphatically: "I can't imagine that anyone in this room honestly thinks those were gifts." Further, to the extent that Attorney Balistrieri claimed that the characterization of the payments as gifts was the accountant's determination on which he had relied, the OLR's expert witness stated that Attorney Balistrieri would need to demonstrate that he had relied on his accountant's advice in good faith. The OLR's expert opined that given the lack of evidence to support a gift, there was no possibility to have relied in good faith on any determination by the accountant that the payments were gifts.

¶36 During the evidentiary hearing, the referee expressed concern with the OLR's pursuit of questioning about the tax

20

implications of the payments and benefits provided to Attorney Balistrieri and whether pursuing the line of questioning would make this a tax case as opposed to a reinstatement proceeding. In response to the referee's request for clarification as to what the OLR was attempting to demonstrate, the OLR's counsel responded that the OLR was primarily concerned with whether Attorney Balistrieri's disclosures about the benefits and payments he received were accurate and sufficient and not really concerned with the issue of whether the payments had been treated properly for income tax purposes.

¶37 In his report, the referee spent little time addressing these issues. Although he acknowledged the difference between the testimony of Attorney Balistrieri's accountant and the OLR's witness, he did not attempt to resolve the dispute. Essentially, he concluded that the tax issues should not be the focus of this proceeding, and that since the IRS had never challenged Attorney Balistrieri's income tax returns, the issue of the payments to Attorney Balistrieri and the tax ramifications of those payments should be disregarded.

¶38 We do not share the view that these matters are unimportant to the question of whether Attorney Balistrieri's license to practice law should be reinstated. As the petitioning attorney, he is obligated under the rule to prove, by clear and convincing evidence, that his conduct since the revocation of his license has been "exemplary and above reproach." SCR 22.29(4)(e). Whether an attorney has properly reported income on the attorney's income tax returns and whether

21

the attorney has properly disclosed the nature and sources of income to the OLR in the reinstatement process are both matters that clearly bear on the attorney's post-suspension or post-revocation conduct and whether he or she has a good moral character and is fit to regain the privilege of acting as an attorney and officer of the court in this state.[11] Indeed, the failure to report income on one's tax returns has been a basis for the imposition of a range of public discipline by this court. See, e.g., In re Disciplinary Proceedings Against Washington, 2007 WI 65, 301 Wis. 2d 47, 732 N.W.2d 24 (18-month suspension imposed on attorney convicted of attempting to evade payment of federal income taxes for underreporting her income); In re Disciplinary Proceedings Against Elverman, 2008 WI 28, 308 Wis. 2d 524, 746 N.W.2d 793 (nine-month suspension imposed; distinction drawn between forgetting to report income over three years, which would have made the court more inclined to impose

---

[11] Attorney Balistrieri's accountant also expressed the view that the federal and state governments were not really harmed because Joseph Balistrieri had not claimed these payments to his brother as an expense of the business and therefore had paid income taxes on the money he shared with Attorney Balistrieri. Whether or not the federal and state governments ultimately received the same amount of tax revenues, which has not been proven, is not the issue. The issue for purposes of this reinstatement proceeding is whether Attorney Balistrieri, the person petitioning for reinstatement, was obligated under the law to report those payments as income on his tax returns and followed the law. Whether Joseph Balistrieri may also have been able to reduce his reportable income if the payments had been characterized as income to Attorney Balistrieri is not at issue in this proceeding.

public reprimand, and deliberately choosing not to report income for two years, which supported the nine-month suspension); In re Disciplinary Proceedings Against McKinley, 2014 WI 48, ___ Wis. 2d ___, 848 N.W.2d 295 (accepting stipulation and imposing 60-day suspension on attorney convicted of filing tax returns she believed to be not true or accurate because of underreporting of income). Thus, the presence of questions about an attorney's proper reporting of income is a relevant part of the reinstatement calculus.

¶39 Although we acknowledge that there is a difference of opinion between the OLR's expert and Attorney Balistrieri's accountant/expert, that acknowledgement does not mean that we are obligated to resolve the dispute and render a definitive ruling on whether Attorney Balistrieri's tax returns were improper. We conclude, however, that there is, at a minimum, a real question about the propriety of Attorney Balistrieri failing to report as income the hundreds of thousands of dollars that he received out of draws from the Shorecrest's accounts. Simply stating the conclusion that the payments should be treated as gifts because Joseph Balistrieri had no legal obligation to make the payments to Attorney Balistrieri begs the question. Had these payments been made simply because Attorney Balistrieri was a family member, that would be one thing. By Attorney Balistrieri's own admission, however, these payments were made to him "[f]or my work at the hotel." Generally, payments made to an employee as a result of the employee's work are income to the employee subject to the payment of all

23

applicable taxes, including income taxes. Attorney Balistrieri's accountant, however, clearly stated that these payments were not reported as income. If these periodic payments over two decades did not need to be reported as income because they were mere gifts from his brother, Attorney Balistrieri needed to prove that fact by clear and convincing evidence. In the absence of such proof, it appears that he received income due to his employment that he did not report as income.

¶40 The fact that the IRS has not challenged Attorney Balistrieri's tax returns does not prove that these payments were actually gifts or that this issue should be disregarded in this reinstatement proceeding. Who knows why the IRS has not audited or challenged the tax returns? Perhaps it is not aware of these payments. Perhaps it has chosen to focus its limited resources on other matters. In any event, it is this court, not the IRS, that ultimately determines whether a petitioning attorney has met the standards required for the reinstatement of the attorney's license.

¶41 As noted above, we need not decide whether or not the "draws" paid to Attorney Balistrieri or the other benefits provided to him were income that needed to be reported on his tax returns. The evidence in the record raises a serious question regarding whether Attorney Balistrieri's conduct since the revocation of his license has been "exemplary and above reproach." He bore the burden to demonstrate that he has met that standard. He has failed to meet his burden on this issue.

24

¶42 There are two other issues, which are related to each other, that were greatly downplayed by the referee. These issues relate to an answer that Attorney Balistrieri gave to questions from the OLR about lawsuits to which he had been a party and to his conduct in connection with a specific lawsuit against his maternal relative, Jennie Alioto.

¶43 The OLR's reinstatement questionnaire asked Attorney Balistrieri to "[s]ubmit a statement showing the dates, general nature, current status, or final disposition of every civil action, commenced or pending in any jurisdiction during the period of your revocation or suspension, wherein you were either a party, plaintiff or defendant, or in which you had or claimed an interest."[12] The question further required Attorney Balistrieri to provide case names and numbers, as well as the court in which the case was pending. Attorney Balistrieri's response did not identify any civil action. Although the question asked for an identification of any civil action in which he had been or was a party, regardless of the disposition, Attorney Balistrieri responded only that "I have no present recollection of any judgment ever being taken against me for any purpose." When asked about this response in multiple questions at his deposition, he again failed to identify any civil action. After taking a break and conferring with his counsel, he stated

---

[12] This question is a standard part of the reinstatement questionnaire that the OLR sends to attorneys who petition for reinstatement following a disciplinary revocation or suspension.

for the first time that he had been involved in a lawsuit with Alioto and in two pieces of litigation involving his sisters, although Attorney Balistrieri claimed that these matters were really his brother's actions and not his and that his brother Joseph had merely added his name to the actions. At the subsequent evidentiary hearing, Attorney Balistrieri claimed that he had no independent recollection of the Alioto litigation until the questions at the deposition had "jogged" his memory.

¶44 At the evidentiary hearing, Attorney Balistrieri admitted that he had been involved in six lawsuits since the time of his first reinstatement petition. There were actually two lawsuits in which Attorney Balistrieri was a plaintiff suing Jennie Alioto. In the first, which will be discussed in more detail below, both Attorney Balistrieri and his brother Joseph were the plaintiffs. After Attorney Balistrieri and his brother lost that lawsuit, a second lawsuit was filed. This time Attorney Balistrieri was the sole plaintiff. In another action, one of his sisters sued both Attorney Balistrieri and his brother Joseph, as well as their other sister.

¶45 The OLR argued that Attorney Balistrieri's failure to identify any of these actions in his response to the reinstatement questionnaire or in his initial deposition answers showed that his conduct in the reinstatement proceeding had not been exemplary and above reproach. After acknowledging that he had been initially troubled by the failure to provide accurate information in response to the OLR's questions, the referee found, based on Attorney Balistrieri's testimony at the

26

evidentiary hearing, that he had really forgotten about these various lawsuits in which he had been a party, thereby concluding that his responses, while inaccurate, had not been deliberately false.

¶46 Given the clearly erroneous standard for reviewing the referee's finding of fact on this subject, especially where the factual issue involves a determination of what was in someone's mind, we accept the referee's finding that Attorney Balistrieri could not recall any of the lawsuits in which he had been involved until the middle of his deposition. We therefore conclude that the inaccurate answers are not a basis to conclude that Attorney Balistrieri has failed to show that his post-revocation conduct has been exemplary and above reproach.

¶47 The failure to recall the Alioto litigation, however, is not the only issue raised by that litigation. The first action in which Attorney Balistrieri and his brother sued Jennie Alioto presents a troubling situation.

¶48 The facts of that litigation are set forth in the decision of the court of appeals, which affirmed the circuit court's judgment dismissing the Balistrieris' claim to enforce a purchase option and awarding costs in favor of Alioto. Balistrieri v. Alioto, No. 2004AP929 (December 1, 2005 unpublished opinion). Alioto worked for Attorney Balistrieri's father as a bookkeeper for many years. Both Attorney Balistrieri and his brother had a long personal relationship with her. Indeed, both brothers performed legal work for her without charge, and Attorney Balistrieri often helped her with

27

her business affairs. In 1978, Attorney Balistrieri helped Alioto purchase a building on North Jackson Street in Milwaukee, and he thereafter quite often assisted her in maintaining or managing the property. The trial court found that Alioto relied on Attorney Balistrieri's assistance and his advice in her business affairs.

¶49 In 1991 Attorney Balistrieri discussed the future of the Jackson Street property with Alioto. She told Attorney Balistrieri that she did not wish to sell the property because she needed the rental income from the property for her retirement, but that she would be willing to give him and his brother a right of first refusal to purchase the property before anyone else if she ever sold it. In 1992, Alioto and the two Balistrieri brothers signed an agreement regarding the property. The agreement, however, did not provide a right of first refusal, but rather gave the brothers an option to purchase the property for a set price ($125,000) within the next ten years. Alioto testified in the subsequent lawsuit that she did not read the agreement before signing it.

¶50 Three months later, Alioto read the agreement and came to understand that it provided for a straight option to purchase at a set price. She then called Attorney Balistrieri and expressed concern that the contract was not what they had previously talked about. In particular, she expressed surprise that the agreement contained a specific purchase price and a specific date by which the option could be exercised by the

brothers. Attorney Balistrieri told her not to worry about what was in the agreement and that he would do right by her.

¶51 In 2002, as the 10-year period came to a close, the Balistrieri brothers both served letters on Alioto that stated that they were exercising their option to purchase the Jackson Street property. When Alioto refused to sell the property to them at the price set forth in the contract, Attorney Balistrieri and his brother sued her for specific performance of the option agreement.

¶52 The case was tried to the bench. The circuit court found that there had been a fiduciary relationship between Attorney Balistrieri and Alioto, that Attorney Balistrieri had engaged in intentional misrepresentation in connection with obtaining the option agreement, that Alioto was justified in relying on Attorney Balistrieri's statement that she had nothing to worry about, and that Attorney Balistrieri and his brother were joint venturers such that Attorney Balistrieri's misrepresentations could be imputed to his brother. The circuit court therefore ruled that the option contract was unenforceable. It dismissed the Balistrieris' claims and awarded costs to Alioto.

¶53 Attorney Balistrieri and his brother appealed. The court of appeals affirmed the trial court's rulings. This court denied the Balistrieris' petition for review.

¶54 The referee also did not view this matter as anything that should prevent the reinstatement of Attorney Balistrieri's license. While the referee said it was not his role to second

29

guess the circuit court's findings or legal conclusions or to re-try the civil action, he specifically said that he questioned the credibility of Alioto's testimony, which the circuit court in the civil action had accepted as credible. He also questioned the circuit court's admission of the recording that Alioto made of her telephone conversation with Attorney Balistrieri, in which he told her not to worry about the fact that the agreement was different than she had initially discussed with him.[13] In the end, the referee found it significant that the attorney who had represented Alioto in the civil action had testified at the reinstatement hearing that the Alioto litigation should not affect this reinstatement proceeding. The referee agreed that the circuit court's findings in the Alioto civil litigation should not "be a barrier" to the reinstatement of Attorney Balistrieri's license.

¶55 We do not think this matter should be disregarded so lightly. The circuit court specifically found, and the court of

---

[13] The Balistrieris challenged the admission of the recording on appeal and argued that the recording provided the sole evidentiary basis for the trial court's ruling. The court of appeals did not rule on whether the recording had been properly admitted. It did conclude that, even if the recording had been improperly admitted, its admission had not prejudiced the outcome of the trial because Alioto had testified at trial based on her independent recollection of her conversations with Attorney Balistrieri. Thus, the admission or exclusion of the tape recording cannot undermine the circuit court's and the court of appeals' conclusions or affect the relevance of those conclusions to the present reinstatement proceeding. Moreover, even the referee acknowledges that Attorney Balistrieri denied having any conversation until the tape recording was produced.

appeals affirmed, that Attorney Balistrieri and his brother had a fiduciary duty to Alioto because of the inequality of sophistication in business matters, the fact that Alioto had been a client of both Balistrieri brothers when they had been practicing lawyers, and the fact that she had continued to rely on Attorney Balistrieri's business advice and support after he was no longer practicing law. The circuit court further found that Attorney Balistrieri had violated this fiduciary duty and had obtained the option contract by intentional misrepresentation. The court of appeals agreed that, in light of Alioto's statements to Attorney Balistrieri that she would be willing to give him and his brother a right of first refusal, his failure to disclose to Alioto that the agreement actually gave them an option to purchase the Jackson Street property for a specific price to be exercised at their sole discretion constituted an actionable failure to speak when disclosure was required and "fulfill[ed] the elements of misrepresentation." In essence, the courts in the Alioto litigation concluded that Attorney Balistrieri took advantage of his superior knowledge of business and the law to obtain an agreement from an older relative that would have benefitted him and his brother financially and then sued her to enforce that agreement. There is no basis to attack and relitigate those conclusions in this proceeding.

¶56 We conclude that engaging in misrepresentation in order to take advantage of a less sophisticated person, especially one with whom there is a fiduciary relationship, does

31

not show a moral character of the type needed to practice law in this state, SCR 22.31(1)(a), does not constitute conduct that is exemplary and above reproach, SCR 22.29(4)(e), and does not demonstrate that Attorney Balistrieri has a proper attitude toward the standards that are imposed upon members of the bar and will act in conformity with those standards, SCR 22.29(4)(f). Such conduct also does not befit a person who "can safely be recommended to the legal profession, the courts and the public as a person fit to be consulted by others and to represent them and otherwise act in matters of trust and confidence." SCR 22.29(4)(g).

¶57 We recognize that, unlike the 1995 reinstatement proceeding, Attorney Balistrieri did present testimony and letters from a significant number of individuals in support of this reinstatement petition. We also acknowledge that the record contains evidence that Attorney Balistrieri has engaged in some charitable activities, including serving as a director and president of a golf tournament that raises money for high school scholarships to private schools.

¶58 In the end, however, this reinstatement proceeding is governed by the rules and standards contained in this court's rules. Those rules require Attorney Balistrieri to prove that he has satisfied all of the requisite standards by clear and convincing evidence. For the reasons described above, we conclude that he has failed to meet his burden to prove that he possesses the requisite moral character to practice law in this state, that his conduct since the revocation of his license has

been exemplary and above reproach, that he has a proper understanding of and attitude toward the standards imposed upon members of the bar, that he will act in conformity with those standards, and that he can be safely recommended as a person fit to be consulted by others, to represent them, and to otherwise act in matters of trust and confidence.

¶59 The final issue to be addressed is the matter of the costs of this proceeding. The OLR submitted a statement of costs indicating that the total costs of the proceeding, as of February 4, 2013, were $41,459.40. It recommended that Attorney Balistrieri be required to pay the full costs of the proceeding, consistent with the court's general policy of imposing the costs of reinstatement proceedings on the petitioning attorney. It noted that this proceeding involved a large amount of discovery and a highly contentious evidentiary hearing.

¶60 Attorney Balistrieri objected to the imposition of costs. He first argued that he should not be required to pay any of the costs of this reinstatement proceeding because the referee had recommended that his license should be reinstated. Attorney Balistrieri analogized this reinstatement proceeding to a disciplinary proceeding where no misconduct is found. Since SCR 22.24(1m) states that this court's general policy is to impose costs "upon a finding of misconduct," costs are not imposed where no misconduct is found and a disciplinary complaint is dismissed. Attorney Balistrieri reasoned that receiving a recommendation for the reinstatement of his license was similar to a finding of no misconduct, and therefore he

33

should not be required to pay any costs. Moreover, he noted that while the OLR had opposed his petition before the referee, it did not appeal the referee's recommendation for reinstatement, making it inequitable to impose costs on him.

¶61 The referee does not agree with Attorney Balistrieri's argument that no costs should be imposed, noting that this court has imposed costs in cases where referees had recommended denial and this court has nonetheless ultimately granted reinstatement.

¶62 This argument by Attorney Balistrieri is easily dispatched. It is this court that makes the final determination on a reinstatement petition, and we have determined that Attorney Balistrieri's petition must be denied. Thus, his argument is no longer supported by the facts. Moreover, this court's general policy has been to impose full costs on the attorney petitioning for reinstatement even where the referee recommends reinstatement and this court grants reinstatement. See SCR 22.24(1m); see, e.g., In re Disciplinary Proceedings Against Ouchakof, 2013 WI 48, ¶16, 347 Wis. 2d 604, 830 N.W.2d 677; In re Disciplinary Proceedings Against Woodard, 2012 WI 41, ¶37, 340 Wis. 2d 248, 812 N.W.2d 511. The reinstatement proceeding is a result of the attorney's misconduct that required the imposition of a suspension or revocation in the first place. It is therefore generally proper to impose the costs of a formal reinstatement proceeding upon the attorney seeking reinstatement.

¶63 Alternatively, Attorney Balistrieri argues that the OLR's requested cost amount that is assessed against him should

34

be "significantly less than the full costs claimed" because the OLR's costs are excessive. Again, Attorney Balistrieri bases his argument for a reduction in costs on the fact that a significant portion of the OLR's time was spent in investigating and litigating issues that the referee found to be of minimal significance or found unpersuasive.

¶64 The referee agrees with this part of Attorney Balistrieri's argument. The referee notes that the applicable rule now in effect envisions a procedure whereby the referee considers the parties' submissions on costs and makes a recommendation. He therefore concludes that under the appropriate circumstances, it is proper to reduce the amount of costs requested by the OLR. He believes that the OLR "treated this matter as some sort of tax court hearing rather than a reinstatement proceeding," which resulted in substantial amounts of time and money being spent on document requests, expert witness preparation, depositions of expert witnesses, and hearing testimony regarding the tax issues. Since the referee concluded that the tax issues were not of any real importance because the IRS had not challenged Attorney Balistrieri's tax returns, he recommends that the OLR's fees and costs related to tax issues should be eliminated from any cost assessment. Specifically, he recommends that the court not impose any of the fees paid to the OLR's expert witness or any of the court-reporting fees for discovery depositions. To avoid going through the invoices of the OLR's counsel, he recommends that

OLR's counsel fees simply be reduced by one-half. This results in a recommended cost total of $19,215.51.

¶65 As demonstrated above, however, we have disagreed with the referee's view that certain issues, including the tax issues, were of little significance in determining whether Attorney Balistrieri met his burden of satisfying the standards for reinstatement. We therefore will not reduce the cost amount for this reason.

¶66 With respect to whether the OLR's costs were simply excessive, Attorney Balistrieri does make reference to a few specific numbers in his objection, both hours expended by the OLR's counsel and its expert witness as well as the corresponding cost amounts. He does not, however, provide any specific reasons why those amounts are too high, except to assert that they related to issues that the referee found to have little significance, which we have already rejected as a reason to reduce the costs. SCR 22.24(2) ("A respondent [or an attorney petitioning for reinstatement] who objects to a statement of costs must explain, with specificity, the reasons for the objection . . . ."). He also does not state what he would consider a reasonable amount of time or fees spent on those issues or tasks. Id. (a respondent attorney in a disciplinary proceeding or an attorney petitioning for reinstatement who objects to costs "must state what he or she considers to be a reasonable amount of costs"). Consequently, we will not reduce the cost assessment on this ground.

¶67  Finally, Attorney Balistrieri asks for a reduction in the costs because of the financial burden it will impose on him and his family.  He contends that the testimony received at the evidentiary hearing shows that he is not a wealthy man.  Plus, he notes that he has already incurred a substantial amount of attorney fees for his own counsel in this reinstatement proceeding.  In situations where an attorney has limited financial resources to pay the costs associated with a disciplinary or reinstatement proceeding, this court has generally not reduced the cost award simply for that reason.  Doing so shifts the burden for those costs to all of the other lawyers in the state who must pay an annual cost assessment for the lawyer regulatory system in order to maintain their law licenses.  The court's general policy in such situations is to direct the attorney to provide financial information to the OLR and to try to negotiate a payment plan for the payment of the costs over time.  We follow that policy here.

¶68  IT IS ORDERED that the petition for reinstatement of the license of John J. Balistrieri to practice law in Wisconsin is denied.

¶69  IT IS FURTHER ORDERED that within 120 days of the date of this order, John J. Balistrieri shall pay to the Office of Lawyer Regulation the full costs of this reinstatement proceeding.

PATIENCE DRAKE ROGGENSACK, J., withdrew from participation.

37

¶70 ANN WALSH BRADLEY, J. *(dissenting).* In an attorney reinstatement proceeding, the referee is the finder of fact. It is the responsibility of the referee to scrutinize and to weigh the testimony of the witnesses and to determine the effect of the evidence as a whole. We are to defer to the referee's assessment of the credibility of witnesses. In re Disciplinary Proceedings Against David V. Jennings, III, 2011 WI 45, ¶39, 334 Wis. 2d 335, 801 N.W.2d 304.

¶71 The majority correctly sets forth the standard of review in reinstatement proceedings: we do not overturn a referee's findings of fact unless they are clearly erroneous. Per curiam, ¶3. Nevertheless, the majority seems to ignore it. In rejecting the referee's "strong" recommendation that Balistrieri's license be reinstated, the majority fails to adequately explain why the referee's findings are clearly erroneous. Instead, it retries the case and reassesses credibility.

¶72 In giving the requisite deference to the role of the referee as the trier of fact and in correctly applying the standard of review, I conclude that the referee's findings are not clearly erroneous. I would accept the referee's findings and grant Balistrieri's reinstatement petition.

¶73 During the three days of the evidentiary hearing, the referee listened to live testimony from 13 "distinguished lawyer[] and non-lawyer[]" witnesses who supported Attorney Balistrieri's reinstatement. Referee Report, ¶27. The OLR examined Balistrieri adversely and called just one witness. In

1

addition to the live testimony, the referee received seven letters in support of reinstatement from people who did not testify at the hearing. Balistrieri's sister wrote two letters opposing reinstatement. After hearing all of the testimony and reading all of the letters, the referee "strongly" recommended that Balistrieri's petition for reinstatement be granted. Referee report, ¶47. The OLR did not appeal the referee's recommendation.

¶74 The referee found that Balistrieri had proven by clear, satisfactory, and convincing evidence that he had met the criteria for reinstatement set forth in SCRs 22.29(4)(a)-(g) and 22.31(1)(a). The referee found that (1) he sincerely desires to have his license reinstated, (2) he has not practiced law during the period of his suspension and revocation, (3) he has complied with the terms of the suspension and revocation orders, (4) he has maintained competence and learning in the law, (5) he has demonstrated that he has the moral character to practice law in this state, (6) his conduct since the revocation of his license has been exemplary and above reproach, (7) he has a proper understanding of and attitude toward the standards that are imposed upon members of the bar and will act in conformity with them, and (8) he can be safely recommended as a person fit to represent clients and to aid in the administration of justice in this state.

¶75 The majority, however, states that it is "not persuaded." In reassessing credibility, the majority asserts that the "record reveals a pattern of a lack of acceptance of

2

responsibility over the years that have passed since Attorney Balistrieri's conviction." Per curiam, ¶22. It cites Balistrieri's response to BAPR's recommendation against reinstatement in 1995 and his answer to a question in a 2002 deposition. Id., ¶¶22-23. The majority grudgingly notes that Balistrieri testified he "made a mistake," but then quotes Balistrieri's testimony that "from my perspective, I really didn't do anything." Id., ¶25.

¶76 The referee wrote that in the 1996 reinstatement proceeding, "one sees a man who by his own admission 'was angry and felt cheated and felt [he] had been handed a raw deal.'" The referee quoted Balistrieri's testimony to show that "[t]oday, Balistrieri sees things differently:

> You know, the judgment of the court was the judgment of the court, which I accept, you know. I was sentenced to a prison term which I served. I don't have that hostility or that feeling of being cheated or of being treated unfairly. I accept all that. And I made a promise to myself two years ago to drop all the anger, to drop all the resentment, and to accept things as they are, to recognize that if the court found that, then that was a justified determination, and I must bear the penalty for it. You know, it was nobody's fault but my own. I made a mistake – people are not perfect – and I paid for it. And now I hope to rehabilitate in the last years of my life my career, and my reputation.

Referee report, ¶26, quoting Tr. p. 476.

¶77 The referee further explained that the record in this reinstatement proceeding was profoundly different than the record in a prior reinstatement proceeding. Thirteen "distinguished lawyers and non-lawyers" testified in support of Balistrieri's reinstatement and seven more wrote letters

3

supporting reinstatement. They all believed he had the moral character necessary to practice law and that he met the criteria for reinstatement. The referee wrote:

> "[T]he record in this 2012 proceeding stands in stark contrast to the record in the 1996 reinstatement proceeding. In 1996, Balistrieri and his brother were the only live witnesses. In 2012, thirteen distinguished lawyers and non-lawyers testified live in support of Balistrieri's petition. In 1996, the U.S. Attorney, the Wisconsin Attorney General and the Milwaukee District Attorney all wrote letters opposing reinstatement. In 2012, only Balistrieri's estranged sister wrote two letters in opposition. Besides the thirteen attorneys who testified, seven more wrote letters in support of Balistrieri's current petition. In short, the record in 2012 is most impressive and overwhelmingly supports reinstatement."

Referee Report, ¶27.

¶78 In finding that Balistrieri had demonstrated by clear, satisfactory, and convincing evidence that he met the criteria for reinstatement set forth in SCR 22.31, the referee summarized the oral and written statements made in support of Balistrieri's reinstatement. Below is a mere sampling of some of those statements. They represent statements from some of the most distinguished attorneys in this state.

- Attorney 1: "Since [Balistrieri's] criminal conviction, he has led an exemplary life without any further involvement or any negative influence. . . . Without reservation, I completely and fully endorse and recommend his reinstatement of his law license."

- Attorney 2: "I strongly recommend that [Balistrieri] be admitted to the State Bar of Wisconsin. He is intelligent, trustworthy and honest. He works hard at

4

every task he assumes and, even though not practicing law, continues to recognize lawyers' duties to clients and to the profession."

- Attorney 3: "I highly recommend that you allow for [Balistrieri's] reinstatement. I am 100% confident that he will practice law in an utmost ethical manner . . . ."

- Attorney 4: "I sincerely believe that it was a privilege for me to meet and work with Mr. Balistrieri and I highly recommend that he be reinstated. He is truly an asset to the legal profession."

¶79 Based upon the referee's credibility determinations and the weight he gave the witnesses' testimony, together with his findings of fact, I conclude there is only one proper result here: granting Balistrieri's petition for reinstatement. Accordingly, I respectfully dissent.